UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

DEANGELO LAMONT MITCHELL,

                    Plaintiff,

vs.

ROLAND OLIVER, *et al.*,

                    Defendants.

Case No.: 2:22-cv-00236-GMN-DJA

**ORDER DENYING MOTION FOR SANCTIONS AND GRANTING PRELIMINARY INJUNCTION**

      Pending before the Court is the Motion for Sanctions, (ECF No. 160), filed by Plaintiff Deangelo Lamont Mitchell. Defendants Jeremy Bean, Charles Daniels, Benedicto Gutierrez, Michael Minev, Roland Oliver, Jayme Cabrera, and Nilo Peret filed a Response,[1] (ECF No. 173), to which Plaintiff replied, (ECF No. 179). For the reasons discussed below, the Court DENIES the Motion for Sanctions but GRANTS a preliminary injunction.

**I.    BACKGROUND**

      This action arises out of Defendants' alleged deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment, specifically deficiency in staffing, delaying treatment of his urethral strictures, and not treating his pain. The facts forming the basis for Plaintiff's Motion for Sanctions are voluminous, but necessary for the Court to document. Many of the facts are contested by Defendants.

///

---

[1] With their Response, Defendants also filed a Motion for Leave to File Plaintiff's Records Under Seal, (ECF No. 174). "[A] party seeking to seal a judicial record. . . bears the burden of overcoming [the] strong presumption [in favor of access] by meeting the 'compelling reasons' standard." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016) (quoting *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)). Defendants seek to seal the medical records submitted to the Court to protect Plaintiff's medical privacy and to maintain these records' confidentiality. For compelling reasons, the Motion for Leave to File Plaintiff's Records Under Seal is GRANTED.

### A. First Preliminary Injunction Order & Aftermath

The Court begins at the hearings on Plaintiff's first Motion for Preliminary Injunction, (ECF No. 9). At the hearings on May 11, 2022, and May 24, 2022, the Court found that Plaintiff's continued self-catheterization and resultant infections amounted to irreparable harm in that the continued self-catheterization made Plaintiff's likelihood of successful urethroplasty less likely because the self-catheterization and infections caused more strictures. At the close of the May hearing, the Court ordered that by July 24, 2022, an appointment for Plaintiff should be made with a urologist for the doctor's next available appointment.

Following that hearing, on May 29, 2022, Plaintiff sent an Inmate Request Form to Benedicto Gutierrez, the Director of Nursing, requesting clean catheters. (*See* May 29, 2022, Inmate Request Form at 2, Ex. 1 to Mot. Sanctions, ECF No. 161-1). Plaintiff suspected the prison began retaliating against him after the preliminary injunction hearings because they ended his supply of clean catheters. (*Id.*). Specifically, Plaintiff stated in the Inmate Request Form: "Until recently, you guys were providing me catheters each week. . . . After my court hearing last week, however, my supply of catheters have [sic] stopped. . . the nurse told me that you guys are mad at me because of my litigation." (*Id.*).

Less than a month later, Plaintiff sent a second request for clean catheters. (*See* June 17, 2022, Inmate Request Form at 2, Ex. 2 to Mot. Sanctions, ECF No. 161-2). He wrote: "[F]or over two (2) weeks I've been having to 're-use' my old, dirty catheters because you guys are refusing to bring me new ones. I now feel that I have a urinary tract infection, and I am becoming ill." (*Id.*). He further stated: "Look, my health is more important than any litigation that I've pursued against you guys. I will drop the lawsuit if you will provide me the catheters I need; and medication to treat my infection. Thank you!" (*Id.*).

In July, Plaintiff filed a First Level Grievance because he had not received a response to his Inmate Request Forms requesting clean catheters and medical treatment for his urinary tract

infection. (*See* July 18, 2022, First Level Grievance at 2, Ex. 3 to Mot. Sanctions, ECF No. 161-3). Plaintiff detailed the alleged retaliation by Defendants and cited an incident with a nurse who stated, "nurses aren't too happy with you. . . you could've given us a chance to resolve your issues before going to the courthouse." (*Id.*).

On July 21, 2022, days before the deadline set by the Court to schedule Plaintiff an appointment with a urologist, Defendants scheduled an appointment for Plaintiff for August 18, 2022, with urologist Dr. Ross Anderson. (Lorin M. Taylor Decl. ¶ 19, ECF No. 65). That same day, Plaintiff sent an Inmate Request Form requesting treatment for a urinary tract infection (the same infection that he described in his June 17 request) that had become so severe he was bedridden. (*See* July 21, 2022, Inmate Request Form at 2, Ex. 4 to Mot. Sanctions, ECF No. 161-4).

In August 2022, Plaintiff saw Dr. Anderson who prescribed several medications and supplies. (August 18, 2022, Medical Encounter at 2, Ex. 5 to Mot. Sanctions, ECF No. 161-5). In October 2022, Plaintiff's counsel emailed the Deputy Attorney General inquiring about the treatment prescribed by Dr. Anderson, none of which had been provided to Plaintiff, and the follow-up visit ordered to take place "on or around 10/19/2022" that did not occur. (*See* November 10, 2022, Emails, Ex. 6 to Mot. Sanction, ECF No. 161-6).

**B. Second Preliminary Injunction Order & Aftermath**

In November 2022, Plaintiff filed his second Motion for Preliminary Injunction, (ECF No. 52), because Defendants did not provide Plaintiff with the medications and supplies Dr. Anderson ordered at the August appointment. A hearing was held on Plaintiff's second request for injunctive relief. Following the hearing on February 27, 2023, the Court ordered that Defendants Roland Oliver, Jeremy Bean, Ben Gutierrez, Nilo Peret, Michael Minev, and Nilo Peret must provide Plaintiff: (1) Sixty (60) Catheters (size Fourteen French) monthly or two per day at pill call; (2) 60 packets of single use lubricant monthly; (3) 1 box of large sterile gloves

Mannose, but not cranberry pills. (Provider Orders Note at 2, Ex. 10 to Mot. Sanctions, ECF No. 161-10).

On May 14, 2024, and with a separate active prescription from Dr. Anderson in April, Plaintiff was out of medication and had to remind NDOC medical staff via medical kite: "An outside urologist (Dr. Ross Anderson) made a previous recommendation for me to be placed on two medications for prevention of urinary tract infections. Namely D-Mannose and Cranberry tablets. . . I am in need of a renewed prescription for both." (*See* May 14, 2024, Medical Kite Form at 2, Ex. 11 to Mot. Sanctions, ECF No. 161-11). On June 6, 2024, Dr. Anderson renewed prescriptions for both D-Mannose and cranberry tablets for another 180 days. (Provider Orders Note at 2, Ex. 10 to Mot. Sanctions). Despite this, Plaintiff alleges he was still not receiving his medications. On July 2, 2024, he submitted a Medical Kite stating that "a prescription that I was given to a pill called D-Mannose and the request that I made for it on June 23, 2024. I'm wondering why I haven't received the medication; as I am in dire need of it for prevention of urinary infections." (*See* July 2, 2024, Medical Kite Form at 2, Ex. 12 to Mot. Sanction, ECF No. 161-12).

Receiving no response, on July 8, 2024, Plaintiff sent an Inmate Request Form: "I write with a question regarding 'why' I haven't been provided my recommended medication, despite the written request that I made for it on June 23, 2024." (*See* July 8, 2024, Inmate Request Form at 2, Ex. 13 to Mot. Sanctions, ECF No, 161-13). Still receiving no response, Plaintiff submitted an informal grievance on July 14, 2024: "this complaint concerns repeated acts on the part of the medical dept to withhold my recommended medication, and its refusal to answer my kites in retaliation to this matter. This complaint seeks to bring administrative recognition to this issue and seeks answers as to why a tacit decision has been made to withhold my medication (when a federal judge, and the attorney general's office) has previously ordered

NDOC officials to provide it." (*See* July 14, 2024, Informal Grievance Form at 2, Ex. 14 to Mot. Sanctions, ECF No. 161-14).

On September 4, 2024, two months after Plaintiff's Medical Kite, and having still not received his medication, he received a response: "you have a current order, and it has been approved by the utilization review committee for your court ordered medication to be continued. Grievance resolved." (*See* July 17, 2024, Inmate Grievance Report at 2, Ex. 15 to Mot. Sanctions, ECF No. 161-15). However, the response failed to address the cranberry tablets, ignoring Plaintiff's need for them, the current prescription for them, and the PI Order ordering Defendants to provide what Dr. Anderson orders.

Plaintiff then had a procedure on September 9, 2024. Dr. Anderson issued new prescriptions on that date for D-Mannose 500 milligram and cranberry tablets 400 milligram, 60 pills each with 11 refills. (*See* September 9, 2024, Discharge Prescription Order Form at 2, Ex. 17 to Mot. Sanctions, ECF No. 161-17). On December 3, 2024, Plaintiff submitted an Inmate Request because he was not receiving his medications: "On November 28 and 29, I was on the call our list [sic] to receive KOP. When I arrived at the pill room on the 29th, however, the nurse at the window stated that there was no medication that could be identified for me." (*See* December 3, 2024, Inmate Request Form at 2, Ex. 19 to Mot. Sanctions, ECF No. 161-19). Then, on January 15, 2025, Plaintiff submitted another Inmate Request Form stating: "I made a formal request for refill of the cranberry tabs. To date, I have not received the refill and I am hoping that you will help!" (*See* January 15, 202 Inmate Request Form at 2, Ex. 20 to Mot. Sanctions, ECF No. 161-20).

On January 16, 2025, Plaintiff's counsel reached out to the Attorney General's office to seek assistance for Plaintiff in getting his medications on time and without interruption. In an email exchange, Deputy Attorney General Jamie Hendrickson indicated after speaking with the Director of Nursing that Plaintiff had received D-Mannose and cranberry tablets in early

December. (*See* January 16, 2025, Email Exchange, Ex. 21 to Mot. Sanctions, ECF No. 161-21).  Plaintiff, however, states that he did not receive the medications which is why he sent the Inmate Request Forms on December 3 and January 15. (Mot. Sanctions 12:17–18).  In fact, the reply to his January 15, 2025, Inmate Request was not made until February 9 and indicates only that he was "seen" and not that he was provided with medication. (*See* January 15, 202 Inmate Request Form at 2, Ex. 20 to Mot. Sanctions, ECF No. 161-20).

On March 27, 2025, Plaintiff's counsel reached out to the Attorney General's office again because Plaintiff was still not getting his prescribed medication. (Mot. Sanctions 13:1–2). Further, Plaintiff was told by an infirmary doctor that only the D-Mannose went through review with the Utilization Review Committee so he would need to wait for it to be ordered, and that he would not be getting the cranberry tablets at all. (*Id.* 13:2–5).  Plaintiff alleges he consistently submitted refill requests before his medications were gone. (*Id.* 13:6–7).  During the relevant time periods Plaintiff submitted requests for D-Mannose and cranberry tablets on 8/17/23, 9/24/23, 11/15/23, 12/10/23, 12/14/23, 2/25/24, 3/25/24, 5/5/24, 6/23/24, 9/22/24, 10/2/24, 10/27/24, 11/25/24, 12/8/24, 12/22/24, 1/3/25, and 2/17/25. (*See* Plaintiff's Refill Requests at 1, Ex. 22 to Mot. Sanctions, ECF No. 161-22).  Despite the refill requests and the Court's order for Defendants to comply with Dr. Anderson's medical orders, Plaintiff states that NDOC is ignoring his refill requests. (Mot. Sanctions 13:10–11).

But Defendants respond that "NDOC records conclusively establish that":
- An order for D-Mannose was filled on 8/30/23 and picked up by Mitchell on 9/6/23;
- An order for Cran Max tablets was filled on 8/22/23 and picked up by Mitchell on 8/29/23;
- On 9/24/23, Mitchell requested a refill of Cran Max tablets, which was filled on 9/29/23; however, there is no record showing that Mitchell picked up order at the pharmacy;

Page 7 of 20

- On 11/5/23, Mitchell requested a refill of Cran Max tablets and D-Mannose, which was filled on 11/8/23 and picked up by Mitchell on 11/14/23;
- On 12/10/23 Mitchell requested refills of Cran Max tablets and D-Mannose, which were ordered on 12/12/23 (Cran Max) and 12/24/23 (D-Mannose) and picked up by Mitchell on 12/19/23 (Cran Max) and 1/10/24 (D-Mannose) (Mitchell requested the D-Mannose prematurely; therefore this prescription was filled on 1/2/24);
- On 2/25/24, Mitchell requested refills of Cran Max tablets and D-Mannose. NDOC filled the order for D-Mannose on 3/1/24, which was picked up by Mitchell on 3/6/24.  The Cran Max prescription had expired and was unable to be filled;
- On 3/25/24, Mitchell requested refills of D-Mannose and Cran Max tablets.  An order for D-Mannose was filled on 5/23/24 and picked up by Mitchell on 5/28/24.  The prescription for Cran Max tablets was still expired as of 5/28/24 and was unable to be filled;
- NDOC filled an order for D-Mannose on 5/23/24 which was picked up by Mitchell on 5/28/24.  The prescription for Cran Max tablets was still expired and unable to be filled;
- On 6/23/24, Mitchell requested a refill of D-Mannose only, which was filled on 7/8/24 and picked up on 7/17/24;
- On 9/22/24, Michell requested a refill of Cran Max tablets, which was filled on 9/29/24 and picked up by Mitchell on 10/4/24;
- On 11/25/24, Mitchell requested a refill of Cran Max tablets only, which was filled on 12/2/24 and picked up by Mitchell on 12/6/24;
- On 12/8/24, Mitchell requested a refill of D-Mannose only, which was filled on 12/11/24 and picked up by Mitchell on 12/18/24;

- On 12/22/24, Mitchell requested a refill of Cran Max tablets only, which was filled on 1/13/25 and picked up by Mitchell on 1/17/25;
- On 1/3/25, Mitchell requested a refill of D-Mannose, which was not filled;
- On 2/17/25, Mitchell requested a refill of Cran Max tablets, which was filled on 2/20/25 and picked up by Mitchell on 2/25/25.

(Resp. 4:16–5:27 (citing Declaration of Megan Sullivan, Exhibit A at ¶ 9)).

Defendants assert that "when viewing the actual medical records as opposed to [Plaintiff's] allegations, [Plaintiff] missed six months of Cran Max (March to September 2024) due to the prescription expiring, and only one refill of D-Mannose (January 2025)." (*Id.* 6:1–4). The Court finds two issues with this allegation. First, the declaration Defendants rely on for this information is not attached as an exhibit to the Response nor do Defendants attach the NDOC records that "conclusively establish" the above information as an exhibit. In fact, the only exhibit attached to the Response is Plaintiff's Supplemental Medical Records, (ECF No. 175), which the Court could use to verify the accuracy of the "fill dates" but nothing else. Second, Defendants' claim that the cranberry tablets prescription was expired from March to September 2024 is unsupported by the record. On June 6, 2024, Dr. Anderson renewed prescriptions for both D-Mannose and cranberry tablets for another 180 days. (Provider Orders Note at 2, Ex. 10 to Mot. Sanctions). Therefore, Plaintiff's prescription for cranberry tablets was active, not expired, from June to September 2024. Moreover, Defendants admit that they failed to fill one refill of Plaintiff's D-Mannose prescription in January 2025 but argue NDOC "has made good faith efforts to substantially comply with the [Preliminary Injunction] Order, regarding the administration of [Plaintiff's] medications." (Resp. 6:20–21). Defendants seem to think partial compliance with a court Order is okay; it's not.

Defendants also seem to suggest that Plaintiff should have purchased the D-Mannose and cranberry tablets he needed at the prison canteen. (*See* Resp. at n. 1 ("Notably, both D-

Mannose and Cran Max are over-the-counter medications that can be purchased by [Plaintiff] from the canteen without a prescription.")). But Plaintiff *cannot* purchase these medicines at the canteen because they are not available on the canteen order form. (*See* Nevada Inmate Store Systems Price List, Ex. 1 to Reply, ECF No. 179-2)). Furthermore, even if these medicines were sold at the canteen, Plaintiff *should not* have to resort to purchasing them at the canteen because of the Court's order to follow Dr. Anderson's medical orders.

Defendants lastly assert that "to guard against [Plaintiff] failing to timely request or pick up his medication, as of April 2025, [Plaintiff's] prescriptions have been placed on an auto-renewal status to ensure he does not miss medication." (Resp. 6:16–18). But this was not done as a courtesy to Plaintiff as Defendants imply. It was done because the law requires it. Nevada Revised Statute 209.3813, effective since October 2023, mandates that the Department of Corrections "ensure that. . . if the prescription is a refill, the prescription is refilled on or before the date on which the current supply of the prescription medication is exhausted." Nev. Rev. Stat. 209.3813. The Court even alerted Defendants on the record, in a hearing on September 13, 2023, that this law was about to take effect. (*See* Trans. of Proceedings, ECF No. 117). Yet NDOC waited until after Plaintiff filed this Motion for Sanctions, a year and a half after the law's effective date, to comply. Defendants maintain that it is Plaintiff's responsibility to seek timely refills by scheduling the medications for automatic refills, completely disregarding the law that makes it Defendants' responsibility. (Resp. 11:18–20 ("steps were taken to correct the issues at the time, and to ensure that [Plaintiff] is relieved of his *own responsibility* to seek timely refills by scheduling the medications for automatic refills.") (emphasis added)).

None of Defendants' arguments regarding the refilling of Plaintiff's D-Mannose and cranberry tablet prescription persuade the Court that they fully complied with the Court's February 23, 2023, Order. Rather, their arguments establish that they not only failed to comply with the Court's order but were in violation of NRS 209.3813 for at least a year and a half.

### D. Missed Follow Up Appointments

The Court finds at least two missed follow up appointments upon review of the record. First, Plaintiff was supposed to attend a follow-up appointment with Dr. Anderson on or around October 19, 2022. Plaintiff was not brought to the appointment, so Plaintiff's counsel emailed the Deputy Attorney General inquiring about the follow-up visit that did not occur. (*See* November 10, 2022, Emails, Ex. 6 to Mot. Sanction). Nothing was resolved so Plaintiff filed a Motion for an Order to Show Cause, (ECF No. 54), and the Court ordered, among other things, that Defendants, "upon receipt of Dr. Anderson's recommendation, have thirty (30) days to comply with Dr. Anderson's medical orders. If Defendants are unable to comply with Dr. Anderson's orders or recommendations, they must notify Plaintiff within the same thirty (30) day period, the reason why they cannot be followed." (*See* PI Order 2:2–5).

Second, in September 2024, Plaintiff had a post-operative follow up visit with Dr. Anderson for one of his procedures. (*See* Mitchell Medical Record at 2, Ex. 16 to Mot. Sanctions, ECF No. 161-16). In the "return to office" notes, Dr. Anderson indicated that the next follow up visit was scheduled for November 7, 2024, at 9:15 am. (*Id.* at 3). However, Plaintiff was not taken to the November 7 follow up appointment. (*See* December 30, 2024, Fax at 4, Ex. 17 to Mot. Sanctions, ECF No. 161-17). Dr. Anderson's office telephoned NDOC on November 8, 2024, and left a voicemail regarding the missed appointment. (*Id.*). Receiving no response, Dr. Anderson's office telephoned NDOC again on November 19 and left a voicemail. (*Id.*). Still receiving no response from NDOC, Dr. Anderson's office left another voicemail and sent a letter to NDOC on November 22. (*Id.*).

Defendants state they "have no records concerning any alleged calls or voicemails left from Dr. Anderson's office regarding an appointment scheduled for November 7, 2024." (Resp. 7:1–2). Defendants cite their Exhibit A "Declaration of Megan Sullivan," to support this assertion, but as mentioned above, they fail to attach Exhibit A or otherwise file it on the docket

for the Court to review. Defendants also contend that the medical records from Plaintiff's September follow-up appointment show Dr. Anderson "*requested* a follow up appointment for November 7, 2024, albeit in a very small font at the bottom of a page." (Resp. 7:3–5 (emphasis in original) (citing Suppl. Medical Records at 18, ECF No. 175)). The "Return to Office" note states verbatim: "Ross Anderson, MD for POST OP 15 at KLN on 11/07/2024 at 9:15 AM." (Suppl. Medical Records at 18). The Court fails to understand how Defendants read the word "request(s)(ed)" into this language. Moreover, the "very small font" that Defendants reference appears to be the same sized font used on the entire page of the medical record Defendants cite. Defendants were ordered by this Court to comply with all of Dr. Anderson's medical orders; this necessarily requires reading such orders. Defendants ultimately contend that "there is no evidence that this missed appointment was the result of willful misconduct or deliberate indifference on the part of Defendants because it is a singular instance of a missed appointment." (Resp. 7:8–10). Defendants, again, rely on the argument that partial compliance with a Court order is permissible.

### E. Issues with Post Operative Treatment

Plaintiff contends Defendants failed to provide him with post-operative lidocaine following a July 2023 surgery. (Mot. Sanctions 8:21–22). Plaintiff informed the Court at a status conference on August 14, 2023, almost one month after the surgery, that he had not been provided post-operative lidocaine as prescribed by the surgeon. At that time, the Court ordered sanctions of $1,000 per day against Defendants for each day that Plaintiff was not provided his prescribed medication. The medication was provided to Plaintiff the same day, which Plaintiff argues indicates that it was available, but Defendants chose not to provide it to him as ordered by the surgeon until the Court ordered Defendants to do so. (*Id.* 9:2–5). Defendants state that lidocaine was ordered by NDOC providers on July 31, 2023. (Resp. 8:10–11 (citing Suppl. Medical Records at 22)). They explain that the lidocaine had to be ordered because it is a non-

formulary drug, so NDOC does not keep a stock of it on hand. (Resp. 8:11–12 (citing Suppl. Medical Records at 21)).  Additionally, Defendants inform the Court that on August 15 (a day after the status conference) they notified Plaintiff's counsel that the delay in providing lidocaine was the result of it being on back order at the time, requiring NDOC to borrow a supply of lidocaine from a local hospital. (Resp. 8:13–15).  Defendants again cite to exhibits they do not attach. (*See* Resp. 8:16).  Plaintiff states that Defendants' explanation for the lidocaine delay, that it was "on back order," only underscores their deliberate indifference. (Reply 6:5–6, ECF No. 179).  He claims that if they were able to borrow a supply of lidocaine from a local hospital immediately after the Court imposed $1,000 daily sanctions, they could have done so immediately upon receiving the prescription. (*Id*. 6:6–9).  Plaintiff believes that they allowed him to suffer until financially compelled to act. (*Id.* 6:9–10).

Next, Plaintiff alleges Defendants failed to provide him with an uninterrupted supply of amoxicillin after his March 2024 surgery. (*See* March 17, 2024, Inmate Request Form at 2, Ex. 9 to Mot. Sanctions, ECF No. 161-9).  In an Inmate Request Form Plaintiff stated: "Out of the 30 pills of Antibiotics (amoxicillin) that I was suppose [sic] to receive, I was only given 15 – and told by one the nurses that the other 15 pills would be given to me through KOP.  To date I haven't received the second round of pills. . . ." (*Id.*).  NDOC gave Plaintiff the rest of the antibiotics on March 20, 2024. (*See id.*).  Defendants state that there was only a five-day delay between Plaintiff running out of amoxicillin and being given a refill, explaining it was unintentional and appears to have been a miscommunication between the medical staff and the pharmacy regarding the timing of the order. (Resp. 9:5–9).  Regardless of the delay length, Defendants violated the Court's order to follow Dr. Anderson's orders (in this case, to supply Plaintiff with a 30-day supply of antibiotics presumably uninterrupted),[3] when there was a

---

[3] Plaintiff does not provide a citation for his assertion that he was ordered to take amoxicillin for 30 days "uninterrupted."  However, it is common knowledge that a person should finish an antibiotic course, like

delay in the supply. Moreover, Defendants argue that a delay between the first and second rounds of antibiotics was not harmful to Plaintiff's recovery because he was prescribed amoxicillin as a post-surgical preventative measure, rather than to treat an active infection. (Resp. 9:10–12). Defendants minimize the importance of complying with Dr. Anderson's post-operative prescription orders, both from a medical standpoint and a judicial authority standpoint.

Plaintiff now moves for case terminating sanctions based on Defendants' conduct throughout the course of this case.

## II. LEGAL STANDARD

Federal courts have inherent authority to impose terminating (case-dispositive) sanctions, including striking a defendant's answer. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). This authority is rooted in the judiciary's fundamental duty to "impose silence, respect, and decorum" in its presence and enforce compliance with lawful mandates. *Id.* Because the sanction of dismissal is drastic, courts must weigh five factors before imposing case-dispositive sanctions: (1) The public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. *Malone v. United States Postal Service*, 833 F.2d 128, 130 (9th Cir. 1987). "The first two of these factors favor the imposition of sanctions in most cases, while the fourth cuts against a dismissal sanction. Thus, the key factors are prejudice and the availability of lesser sanctions. *Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir. 1990). In addition to the factors, terminating sanctions are only justified when a party's misconduct reflects "willful deception,

---

amoxicillin, as prescribed, and that stopping antibiotics early may lead to bacteria forming or other adverse effects.

obstruction, or abuse of the judicial process" that prejudices the opposing party and undermines the court's authority. *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958 (9th Cir. 2006).

### III. DISCUSSION

Plaintiff brings the instant motion alleging multiple, and repeated, violations of this Court's orders; most recently, Defendants' violations of the Court's February 2023 PI Order. Plaintiff ultimately requests that this Court strike Defendants' Answer and enter default against Defendants. (*See generally* Mot. Sanctions). The Court cannot reach the merits of Plaintiff's Motion for Sanctions, however, because Defendants raise a dispositive issue that precludes Plaintiff from the relief he requests.

**A. Sanctions**

Defendants argue that they had a good faith belief that the PI Order expired under the Prison Litigation Reform Act ("PLRA"). (Resp. 16:6–17:12). 18 U.S.C. § 3626(a)(2) provides in relevant part that:

> In any civil action with respect to prison conditions. . . the court may enter a temporary restraining order or an order for preliminary injunctive relief. . . . Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief [that "such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation"] and makes the order final before the expiration of the 90–day period.

18 U.S.C. § 3626(a)(2). Thus, despite ordering that the PI Order "shall remain in effect, month to month, until either this case is resolved, or this Order is expressly overruled," (PI Order 2:6–7), the Court's PI Order expired on May 28, 2023, because the Court did not make the findings required under 18 U.S.C. § 3626(a)(1) nor did it make the order final before the PI Order expired as required by the PLRA. Because the PI Order expired, the Court will not sanction Defendants for their violations of the expired Order. Thus, Plaintiff's Motion for Sanctions is DENIED.

## B. Preliminary Injunction

In cases such as this, however, district courts may enter subsequent injunctions after the first one expires. *Mayweathers v. Newland*, 258 F.3d 930, 936 (9th Cir. 2001). "Nothing in the [PLRA] limits the number of times a court may enter preliminary relief. If anything, the provision simply imposes a burden on plaintiffs to continue to prove that preliminary relief is warranted." *Id.* Therefore, the Court can issue another injunction without violating the PLRA if Plaintiff meets his burden of proving that preliminary relief is still warranted. Accordingly, the Court construes Plaintiff's Motion for Sanctions, in the alternative, as a Motion for Renewed Preliminary Injunction Relief.[4]

Federal Rule of Civil Procedure 65 governs preliminary injunctions. Fed. R. Civ. P. 65. Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). A plaintiff seeking a preliminary injunction must establish four elements: (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the

---

[4] The Supreme Court "has long recognized that a district court possesses inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631 (1962). This inherent power has two limitations. First, "[t]he exercise of an inherent power must be a 'reasonable response to the problems and needs' confronting the court's fair administration of justice.'" *Dietz*, 579 U.S. at 45 (quoting *Degen v. United States*, 517 U.S. 820, 823–824 (1996). Second, the exercise of an inherent power cannot be contrary to any express grant of or limitation on the district court's power contained in a rule or statute. *Dietz*, 579 U.S. at 45–46; Fed. R. Civ. P. 83(b) (district courts can "regulate [their] practice in any manner consistent with federal law"). As to the first point, the Court finds that construing the Motion for Sanctions as a request for renewed preliminary relief is a reasonable response to the problems and needs confronting the Court's fair administration of justice. Directing Plaintiff to file another Motion for Preliminary Injunction and waiting for it to become fully briefed would only delay matters. The Motion for Sanctions—requesting a far greater remedy than preliminary relief—is fully briefed, Defendants are on notice of Plaintiff's position and had an opportunity to respond. Significantly, Defendants were the ones that informed the Court that it could issue another preliminary injunction without violating the PLRA. (*See* Resp. 16:13–15). Defendants also stated that despite the February 2023 PI Order being expired, they would continue to "follow the dictates" of the PI Order. (*Id.* 17:2–5). As to the second point, the Court does not find any rule or statute that stands in contradiction to its decision to construe the Motion for Sanctions as a request for preliminary relief in the alternative. Thus, the Court finds that Defendants are not prejudiced by the Court determining whether preliminary relief is still warranted, and it uses its inherent authority to do so.

absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Id.* at 20.  "[C]ourts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24 (internal quotation marks omitted).  The Court takes up each element below.

### 1. Likelihood of Success on the Merits

The Court has addressed Plaintiff's likelihood of success in previous hearings on the first and second Motions for Preliminary Injunction. (*See* Minutes of Proceedings, ECF Nos. 25, 39, 74).  Accordingly, the Court need not readdress them here and finds that Plaintiff continues to demonstrate a likelihood of success on the merits of his Eighth Amendment claim.[5]  Thus, this element weighs in favor of granting preliminary relief.

### 2. Irreparable Harm

A party seeking a preliminary injunction must demonstrate "that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22.  A party "must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

---

[5] The Court is not required to determine, nor does it determine in this Order, whether there is a reasonable likelihood that Plaintiff will succeed on the new claims he alleges in his Amended Complaint, (ECF No. 166). The likelihood of success on a single claim is sufficient if that claim supports the injunctive relief sought. *See Dowl v. Williams*, No. 13-cv-119-HRH, 2018 WL 2392498, at *1 (D. Alaska May 25, 2018) ("A plaintiff need not establish that he is likely to succeed on the merits of all his claims.  A TRO or preliminary injunction may issue if a plaintiff can show he is likely to succeed on one claim and that he meets the other three requirements for injunctive relief.") (citing *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 n.3 (9th Cir. 2014)).

1    Here, the deprivation of Plaintiff's constitutional rights under the Eighth Amendment is
2    itself sufficient to establish irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976)
3    ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably
4    constitutes irreparable injury."); *Nelson v. Nat'l Aeronautics & Space Admin*, 530 F.3d 865,
5    882 (9th Cir. 2008), *rev'd on other grounds*, 562 U.S. 134 (2011) ("Unlike monetary injuries,
6    constitutional violations cannot be adequately remedied through damages and therefore
7    generally constitute irreparable harm."); *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1282
8    (N.D. Cal.2014) ("Irreparable harm is presumed if plaintiffs are likely to succeed on the merits
9    because a deprivation of constitutional rights always constitutes irreparable harm."). Thus, this
10   element weighs in favor of granting preliminary relief.

### 3. Balance of the Equities

In considering the equities of a preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* Defendants previously argued that their interest in managing their medical procedures and resources, outweighs any interest Plaintiff may have in immediate care because Plaintiff has been provided the care he seeks. (Resp. to Second Prelim. Inj. 10:21–2, ECF No. 63).

First, as to Defendants' "resources" argument, when adjudicating a preliminary injunction motion, the Ninth Circuit expects lower courts to protect physical harm to an individual over monetary costs to government entities. *See Harris v. Board of Supervisors, Los Angeles County*, 366 F.3d 754, 766 (9th Cir. 2004) ("[f]aced with [ ] a conflict between financial concerns and preventable human suffering, [the court has] little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor.") (quoting *Lopez v. Heckler*,

713 F.2d 1432, 1437 (9th Cir.1983).  Second, it is clear Plaintiff is not receiving the care he needs because Plaintiff's Motion for Sanctions demonstrates instances where Defendants failed to provide Plaintiff with his prescribed medications and did not take him to a follow-up appointment, in violation of this Court's February 2023 PI Order.  Thus, the Court finds that this element weighs in favor of granting preliminary relief.

### 4. Public Interest

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir.2012); *see also United States v. Raines*, 362 U.S. 17, 27 (1960) ("[T]here is the highest public interest in the due observance of all the constitutional guarantees.").  "In addition, 'the public has a strong interest in the provision of constitutionally-adequate health care to prisoners.'" *McNearney v. Washington Dep't of Corr.*, No. C11-5930 RBL/KLS, 2012 WL 3545267, at *16 (W.D. Wash. June 15, 2012), *report and recommendation adopted*, No. 11-CV-5930-RBL/KLS, 2012 WL 3545218 (W.D. Wash. Aug. 16, 2012), *and modified*, No. C11-5930 RBL/KLS, 2013 WL 392489 (W.D. Wash. Jan. 31, 2013) (quoting *Flynn v. Doyle*, 630 F. Supp. 2d 987, 993 (E.D. Wis. 2009)).

There is no public interest in Plaintiff's continued suffering during the pendency of this litigation.  The public interest favors a preliminary injunction requiring that Defendants comply with the Eighth Amendment by providing sufficient medical treatment.

Pursuant to the PLRA, the Court must also give substantial weight to any adverse impact on public safety or the operation of the criminal justice system caused by the preliminary relief. 18 U.S.C. § 3626(a)(2).  There is no evidence in this case that either public safety or operation of the criminal justice system is impacted.  Thus, this element weighs in favor of granting preliminary relief.

In sum, the Court finds that Plaintiff continues to prove that preliminary relief is warranted in this case.

## IV. CONCLUSION

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Sanctions, (ECF No. 160), is **DENIED** without prejudice.

**IT IS FURTHER ORDERED** that Defendants' Motion to Seal, (ECF No. 174), is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff is **GRANTED** another preliminary injunction that will automatically expire in 90 days under the PLRA.

**IT IS FURTHER ORDERED** that Defendants,[6] upon receipt of Dr. Anderson's recommendation, have thirty (30) days to comply with the medical orders or recommendations. If Defendants are unable to comply with Dr. Anderson's orders or recommendations, they must notify Plaintiff within the same thirty (30) day period, the reason why they cannot be followed.

<u>Partial compliance with this Court's Order will not be tolerated</u>.

**DATED** this __13__ day of January, 2026.

_____
Gloria M. Navarro, District Judge
United States District Court

---

[6] As explained in the PI Order, (ECF No. 76), the Court clarifies that in this context, the 30-day clock begins as soon as Defendants (and not their counsel) receives medical records. Defendants shall continue their current practice of requesting medical records on the same day of the medical visit.